1
2
3
4
5
6                  UNITED STATES DISTRICT COURT
7                 CENTRAL DISTRICT OF CALIFORNIA
8
9   TRISH HERREMANS, individually, and    )  CASE NO. CV 14-02363 MMM (PJWx)
10  on behalf of a class of similarly situated )
    individuals,                           )
11                                          )  ORDER GRANTING DEFENDANT'S
                      Plaintiff,            )  MOTION TO DISMISS
12                                          )
              vs.                           )
13                                          )
    BMW OF NORTH AMERICA, LLC,              )
14                                          )
                      Defendant.            )
15
16          On March 27, 2014, Trish Herremans filed this putative class action on her own behalf and

17  on behalf of a class of similarly situated Californians against BMW of North America, LLC

18  ("BMW").[1]  On June 6, 2014, Herremans filed a first amended complaint.[2]  BMW filed a motion

19  to dismiss the amended complaint on July 17, 2014,[3] which the court granted with leave to amend

20  on October 3, 2014.[4]

21
22
23
_____

24      [1]Complaint, Docket No. 1 (Mar. 27, 2014).

25      [2]First Amended Complaint ("FAC"), Docket No. 15 (June 6, 2014).

26      [3]Motion to Dismiss First Amended Complaint, Docket No. 17 (July 17, 2014).

27      [4]Order Granting Motion to Dismiss First Amended Complaint ("Order"), Docket No. 30
28  (Oct. 3, 2014).

Herremans filed a second amended complaint on October 23, 2014,[5] which BMW moved to dismiss on November 6, 2014.[6]  Herremans opposes the motion.[7]  Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the court finds this matter appropriate for decision without oral argument; the hearing calendared for February 23, 2015, is therefore vacated, and the matter taken off calendar.

## I.  FACTUAL BACKGROUND

On November 15, 2008, Herremans purchased a new 2009 Mini Cooper for personal, non-commercial purposes.[8]  The vehicle was manufactured, advertised and marketed, distributed and sold by BMW.[9]  Herremans contends BMW advertises that Mini Coopers are safe, reliable vehicles of the highest quality and durability; its marketing materials purportedly assert that "[n]ot all small cars are created equal."[10]  The Mini Cooper was covered by a standard manufacturer's limited warranty.[11]

As of February 12, 2011, Herremans had driven the Mini Cooper 43,667 miles, and had the vehicle's mechanical water pump, which was leaking, repaired under the manufacturer's limited warranty.[12]  After repairing the water pump, BMW allegedly advised Herremans that the

---

[5]Second Amended Complaint ("SAC"), Docket No. 33 (Oct. 23, 2014).

[6]Motion to Dismiss Second Amended Complaint ("Motion"), Docket No. 36 (Nov. 6, 2014). See also Reply in Support of Motion to Dismiss ("Reply"), Docket No. 41 (Feb. 9, 2015).

[7]Opposition to Motion to Dismiss Second Amended Complaint ("Opposition"), Docket No. 40 (Feb. 2, 2015).

[8]SAC, ¶ 20.

[9]*Id.*

[10]*Id.*, ¶ 2.

[11]*Id.*, ¶ 21.

[12]*Id.*

problem had been solved.[13]  On January 11, 2013, however, after Herremans had driven the vehicle 71,272 miles, she discovered that the water pump was leaking once again, and took it in for repairs.[14]  Because the repairs were not covered by the limited warranty, Herremans had to pay more than $1,700 to have the problem fixed.[15]  She asserts that the leaks were caused by a "water pump defect."[16]

On January 7, 2014, Herremans sent a letter concerning the water pump defect to BMW pursuant to the Consumer Legal Remedies Act.[17]  She alleges that BMW did not respond substantively to her request for a remedy.[18]

Herremans filed this action on behalf of all Californians who purchased or leased certain allegedly defective Mini Coopers designed, manufactured, marketed, distributed, sold, and leased by BMW.  She identifies the following as class vehicles – Mini Cooper R55 model vehicles (model year 2007-present Mini Cooper Clubman); Mini Cooper R56 model vehicles (model year 2007-2013 Mini Cooper hardtop); Mini Cooper R57 model vehicles (model year 2009-present Mini Cooper convertibles); Mini Cooper R58 model vehicles (model year 2012 Mini Cooper Roadsters); and Mini Cooper R60 model vehicles (model year 2010-present Mini Cooper Countrymen) (collectively, the "class vehicles").[19]  Herremans alleges that the class vehicles have a water pump defect caused by the fact that the mechanical water pump in the cars was defectively designed, manufactured, and installed.[20]  Specifically, she asserts that the two row sealed ball

---

[13]*Id.*

[14]*Id.*

[15]*Id.*

[16]*Id.*

[17]*Id.*, ¶ 22.

[18]*Id.*

[19]*Id.*, ¶ 3.

[20]*Id.*, ¶ 33.

bearing system that connects the water pump's metal shaft to a pulley driven by the engine and to an impeller, which circulates water through the engine, is defective.[21]  The ball bearings are allegedly encased in ball bearing cages, which are in turn encased in a sealed bearing system.  The sealed bearing system allows the metal shaft to spin while the remainder of the water pump remains bolted to the engine.  The spinning of the metal shaft causes the impeller to spin, circulating water through the engine.[22]  The metal shaft is connected to a pulley driven by the engine.[23]  Herremans contends that the amount of stress placed on the sealed bearing system by the pulley "exceeds the engineering limitations of the two row ball bearing design."[24]  Consequently, the sealed bearing system has purportedly experienced a high failure rate, making it unreliable.[25]  When the sealed bearing system fails, the mechanical water pump allegedly leaks and makes noise.[26]  The metal shaft can also purportedly stop rotating.[27]  Both the water leak and failed rotation of the metal shaft can purportedly cause engine overheating.  Herremans asserts this poses a serious safety hazard because when an engine overheats while the vehicle is being driven, catastrophic engine failure can result.[28]  This in turn can cause the vehicle to lose its ability to accelerate, and cause a malfunction in power brake and steering systems.[29]

Herremans alleges, on information and belief, that BMW knew of the defect prior to distributing the class vehicles to Mini Cooper dealerships.  She asserts that it learned of the defect

---

[21]*Id.*, ¶¶ 5-7.

[22]*Id.*, ¶ 6.

[23]*Id.*, ¶ 5.

[24]*Id.*, ¶ 7.

[25]*Id.*

[26]The noise allegedly indicates that the mechanical water pump will soon leak.  *Id.*, ¶ 33.

[27]*Id.*, ¶ 7.

[28]*Id.*, ¶¶ 8, 33.

[29]*Id.*

through internal testing, pre-release testing data, customer complaints, dealership repair records, and "other internal sources."[30]   Nonetheless, she maintains, BMW failed to disclose and actively concealed the defect from consumers at the time they purchased and/or leased class vehicles despite the fact that consumers did not know of, and could not reasonably have discovered, it.[31] She also asserts that BMW failed to remedy the defect when class members' vehicles experienced mechanical water pump failure outside the warranty period.[32]   Specifically, she asserts that BMW redesigned the mechanical water pump so that the sealed bearing system had one row of bearings in a ball bearing configuration and a second row in a roller bearing configuration; this allegedly created more tensile strength, making the sealed bearing system less prone to failure.[33]   Herremans contends, on information and belief, that this redesigned mechanical water pump was available as a replacement part in 2012; given the extensive research necessary to redesign the part, and the redesign effort undertaken, she asserts that BMW has been aware of the defect since as early as 2006.[34]

Herremans alleges that BMW also knew of the defect because both it and the National Highway Traffic Safety Administration ("NHTSA") received numerous consumer complaints concerning the problem.[35]   BMW purportedly continues to conceal the defect and deny its existence while routinely denying consumer requests for reimbursement of expenses incurred as a result of it.[36]   She asserts that BMW has not disclosed that repairs will not permanently fix the

---

[30]*Id.*, ¶ 12.

[31]*Id.*, ¶ 13.

[32]*Id.*, ¶ 17.

[33]*Id.*

[34]*Id.*, ¶ 18.

[35]*Id.*, ¶¶ 15-16.

[36]*Id.*, ¶ 15

problem, and that the defect constitutes a serious safety hazard.[37]  The water pump defect has allegedly caused consumers to incur repair expenses similar to the $1,700 Herremans paid to have her vehicle repaired, and has also diminished the value of the class vehicles.[38]

Herremans pleads claims for violation of the California Consumers Legal Remedies Act ("CLRA"), California Civil Code §§ 1770 (a)(4), (a)(5), (a)(7), (a)(9); violation of California's Unfair Competition Law ("UCL"), California Business and Professions Code § 17200, *et seq.*; and fraud by omission.[39]

## II.  DISCUSSION

### A.    Legal Standard Governing Motions to Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory," or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988).  The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995).

The court need not, however, accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly*, 540 U.S. 544, 553–56 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do").  Thus, a plaintiff's complaint must "contain

---

[37]*Id.*, ¶¶ 7-8.

[38]*Id.*, ¶ 26.

[39]*Id.*, ¶¶ 71-108.

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); see also *Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly*).

1

**B.      Whether Herremans' CLRA and Fraud Claims are Time-Barred**[40]

2

BMW first asserts that Herremans' CLRA and fraud claims are time-barred.  The statute

3

of limitations on both CLRA and fraud claims is three years.  CAL. CIV. CODE § 1783 (the statute

4

of limitations on a CLRA claim is three years "from the date of the commission of [the

5

challenged] such method, act, or practice"); CAL. CODE CIV. PROC. § 338(d) (providing a three

6

year limitations period for "action[s] for relief on the ground of fraud").  A fraud claim "is not

7

to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting

8

the fraud or mistake." CAL. CODE CIV. PROC. § 338(d).  "The discovery rule only delays accrual

9

until the plaintiff has, or should have, inquiry notice of the cause of action." *Fox v. Ethicon*

10

*Endo-Surgery, Inc.*, 35 Cal.4th 797, 807 (2005); see *Rosal v. First Federal Bank of California*,

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[40]BMW does not contend that Herremans' UCL claim is time-barred.  The Ninth Circuit has held that UCL claims "are subject to a four-year statute of limitations which beg[i]n[s] to run on the date the cause of action accrue[s], not on the date of discovery." *Karl Storz Endoscopy-America, Inc. v. Surgical Tech., Inc.*, 285 F.3d 848, 857 (9th Cir. 2002) (citing CAL. BUS. & PROF. CODE § 17208).  After the Ninth Circuit decided *Karl Storz*, the California Supreme Court held that the statute of limitations governing UCL deceptive practices claims is subject to the delayed discovery rule. *Aryeh v. Canon Business Solutions, Inc.*, 55 Cal.4th 1185, 1196 (2013) ("[W]e conclude the UCL is governed by common law accrual rules to the same extent as any other statute.  That a cause of action is labeled a UCL claim is not dispositive; instead, 'the nature of the right sued upon' . . . and the circumstances attending its invocation control the point of accrual.  The common law last element accrual rule is the default . . . , while exceptions to that rule apply precisely to the extent the preconditions for their application are met, as would be true under any other statute," disapproving *Snapp & Associates Ins. Services, Inc. v. Malcome Bruce Burlingame Robertson*, 96 Cal.App.4th 884, 891 (2002)).  Because Herremans' UCL claim is based on allegations of fraudulent omission, under *Aryeh*, it cam benefit from delayed accrual under the discovery rule. *Broberg v. The Guardian Life Ins. Co. of America*, 171 Cal.App.4th 912, 920-21 (2009) (just like common law fraud claims, a UCL deceptive practices claim based on fraud accrues "only when a reasonable person would have discovered the factual basis for a claim").  Although the Ninth Circuit's interpretation of California law is "'binding in the absence of any subsequent indication from the California courts that [its] interpretation was incorrect,'" *Jones–Hamilton Co. v. Beazer Materials & Servs., Inc.*, 973 F.2d 688, 696 n. 4 (9th Cir. 1992) (quoting *Owen v. United States*, 713 F.2d 1461, 1464 (9th Cir. 1983)), *Aryeh* clearly indicates that *Karl Storz Endoscopy* incorrectly held that the delayed discovery rule does not apply to UCL claims. *Plumlee v. Pfizer, Inc.*, Case No.: 13–CV–00414–LHK, 2014 WL 4275519, *6 n. 5 (N.D. Cal. Aug, 29, 2014).  Consequently, to the extent Herremans can show that accrual of the claim was tolled by delayed discovery, the cause of action will be timely.

671 F.Supp.2d 1111, 1131 (N.D. Cal. 2009) ("Plaintiffs are charged with presumptive knowledge of an injury if they have information of circumstances to put them on inquiry or if they have the opportunity to obtain knowledge from sources open to their investigation," citing *Fox*, 35 Cal.4th at 807-08).  The limitations period on a CLRA claim generally begins to run on the date the allegedly wrongful act was committed – here, the date Herremans purchased her vehicle.  CAL. CIV. CODE § 1783 ("Any action brought under the specific provisions of [the CLRA] shall be commenced not more than three years *from the date of the commission of such method, act, or practice*" (emphasis added)).  The limitations period is subject to tolling by the delayed discovery rule, however.  See *Keegan v. American Honda Motor Co., Inc.*, 284 F.R.D. 504, 543 (C.D. Cal. 2012) ("The discovery rule tolls the statute of limitations for CLRA claims").

The complaint alleges that "on or about February 12, 2011, at 43,667 miles, [Herremans'] Vehicle underwent repairs due to the mechanical water pump leaking."[41]  Citing this allegation, BMW argues that Herremans first became aware of the defect, and the limitations period on her CLRA and fraud claims began to run, that day.[42]  Since Herremans filed this action on March 27, 2014, more than three years later, BMW contends her CLRA and fraud claims are time-barred. Herremans counters that her claims are not time-barred because the statutes of limitations governing her claims were tolled under the delayed discovery rule and/or the doctrine of fraudulent concealment.

"In order to invoke [the delayed discovery exception] to the statute of limitations, the plaintiff must specifically plead facts which show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence."  *In re Conseco Insurance Co. Annuity Marketing & Sales Practices Litigation*, No C-05-04726 RMW, 2008 WL 4544441, *8 (N.D. Cal. Sep. 30, 2008) (quoting *Saliter v. Pierce Bros. Mortuaries*, 81 Cal.App.3d 292, 296 (1978)); see *E-Fab, Inc. v. Accountants, Inc. Services*, 153 Cal.App.4th 1308, 1319 (2007) ("A plaintiff whose complaint shows on its face that his claim would be barred without the benefit

---

[41]SAC, ¶ 12.

[42]Motion at 10.

of the discovery rule must specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence.  The burden is on the plaintiff to show diligence, and conclusory allegations will not withstand demurrer," quoting *McKelvey v. Boeing North American, Inc.*, 74 Cal.App.4th 151, 160 (1999)); see also *Keilholtz v. Lennox Hearth Products Inc.*, No. C 08-00836 CW, 2009 WL 2905960, *3 (N.D. Cal. Sept. 8, 2009) ("To invoke the delayed discovery rule, the plaintiff must plead facts showing: '(a) Lack of knowledge.  (b) Lack of means of obtaining knowledge (in the exercise of reasonable diligence the facts could not have been discovered at an earlier date).  (c) How and when he did actually discover the [facts underlying the claim],'" quoting *General Bedding Corp. v. Echevarria*, 947 F.2d 1395, 1397 (9th Cir. 1991)).  As the *McKelvey* court recognized, this rule applies even where plaintiff is prosecuting a class action.  See *McKelvey*, 74 Cal.App.4th at 160-61 (applying the standard in a putative class action).

If the delayed discovery rule applies, the statute of limitations is tolled until "the plaintiff discovers, or has reason to discover, the cause of action."  *Fox*, 35 Cal.4th at 807 (citing *Norgart v. Upjohn Co.*, 21 Cal.4th 383, 398 (1999); *Neel v. Magana, Olney, Levy, Cathcart & Gelfandi*, 6 Cal.3d 176, 187 (1971)).  A plaintiff has reason to discover a cause of action when he or she "has reason at least to suspect a factual basis for its elements."  *Norgart*, 21 Cal.4th at 398 (citing *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1100 (1988)).

In her opposition to BMW's motion to dismiss the first amended complaint, Herremans argued that the mere fact her water pump leaked and was repaired, while under warranty, did not put her on notice that BMW had failed to disclose the water pump defect.  The court did not find this argument persuasive, as her complaint contained no allegations as to how or when she first discovered the defect, nor any facts indicating why, in the exercise of reasonable diligence, she could not have discovered the defect earlier.[43]  The second amended complaint fares no better. In it, Herremans alleges she did not discover the defect until "in or about January 2013" when she was forced to pay for the second repair; she contends she was not on inquiry notice after the first

---

[43]Order at 9-10.

repair because she suffered no "appreciable harm," and had no reason to be suspicious because the repair was covered by the warranty.[44]  BMW contends this position is untenable because it would effectively toll any product defect claim until the warranty period expired.  It cites *Speier-Roche v. Volkswagen Group of America Inc.*, No. CV 14-20107, 2014 WL 1745050 (S.D. Fla. Apr. 30, 2014), in which a court in the Southern District of Florida rejected an almost identical argument concerning allegedly defective brake pads.

In *Speier-Roche*, the plaintiff sued Volkswagen, alleging that the brake pads and rotors on her 2007 Audi were defective and required premature replacement every 7,500 to 15,000 miles. *Id.*  The vehicle was sold with a twelve month or 12,000 mile deterioration warranty for items that deteriorate due to normal wear, such as "brake discs" and "brake pads."  *Id.* at *2.  On March 13, 2008, while plaintiff's vehicle was still covered by the deterioration warranty, she had to replace the front brake pads.  *Id.*  Because the vehicle was still under warranty, the repair was free.  *Id.*  Roughly one year later, in March 2009, and again in February 2010, plaintiff was required to replace the brake pads a second and third time; on those occasions, she paid for the repairs.  *Id.*

The court found that several of plaintiff's claims – including her claims for breach of warranty and common law fraud – were time-barred.  In reaching this conclusion, it focused on the allegedly unexpected nature of the brake pad failure, as plaintiff premised her claims on the fact that "consumers do not expect to have to inspect or replace the brake pads or rotors after only 7,500 to 15,000 miles."  *Id.*  The court concluded that the statute of limitations began to run on March 13, 2008, when plaintiff experienced the first "premature" failure of the brake pads and rotors and brought the vehicle in for free repair under warranty.  *Id.* at *4-5.  At that point, it stated, plaintiff "was put on notice of her claim" because "her vehicle needed its first allegedly 'premature' brake pad and rotor replacement."  *Id.*  Stated differently, because the initial repair was just as "unexpected" and "premature" as the second and third, the court concluded plaintiff was as much on inquiry notice at that point as she was when required to pay for the repairs.

---

[44]SAC, ¶¶ 21, 58-61.

Notwithstanding *Speier-Roche*, the fact that a water pump leaked once may not, under all circumstances, put a vehicle owner on notice that there is a systemic problem with her automobile; this is especially true where the wrongful conduct the plaintiff alleges is non-disclosure of a defect by a defendant with knowledge thereof. See *In re MyFord Touch Consumer Litig.*, __ F.Supp.2d __, 2014 WL 2451291, *11 (N.D. Cal. May 30, 2014) ("First, a single problem with MFT did not establish that there was a systemic problem with the system. Second, and even more important, even after successive problems with the MFT system, that does not in and of itself establish that Plaintiffs should therefore have known of Ford's alleged *fraud* in concealing the extent of the problems with the MFT system"); *Chamberlan v. Ford Motor Co.*, 369 F.Supp.2d 1138, 1148 (N.D. Cal. 2005) ("The mere fact that a consumer's manifold failed does not necessarily mean that that person should have discovered Defendant's alleged non-disclosure at that time"); cf. *In re Ford Motor Co. Vehicle Paint Litig.*, No. MDL 1063, 1997 WL 539665, *10 (E.D. La. Aug. 27, 1997) ("To toll the statute of limitations, plaintiff must demonstrate that, given the defendant's deceptive behavior, a reasonably diligent plaintiff would not have discovered his or her claim earlier. In this case, to be reasonably diligent, the plaintiff must have, at a minimum, made a reasonable inquiry to a dealer or an expert into the causes or repairability of the paint problem within one year of noticing the paint peel. If such an inquiry was *not* made within one year, the plaintiff's claims are time-barred. If such an inquiry was made, and suit was filed within a year of that inquiry, the action is timely. If such an inquiry was made, but plaintiff waited more than a year thereafter to file suit, the court must examine plaintiff's and Ford's subsequent cause of conduct in order to determine whether the plaintiff's inaction was reasonable.").

Herremans alleges that the first water pump failure was premature, and contrary to reasonable consumer expectations. Defendants contend these allegations show that she should have been on notice that she needed to investigate whether the car had a defect. Herremans also alleges, however, that she was told "the repairs [had] rectified the problem,"[45] and that she lacked

---

[45]*Id.*, ¶ 21.

"sophisticated [knowledge] about automobiles."[46]  "A plaintiff's sophistication in the subject areas is relevant in determining [the] reasonableness [of her diligence]."  *In re Simon II Litig.*, 211 F.R.D. 86, 143 (E.D.N.Y. 2002) (discussing the diligence of consumers who sued cigarette manufacturers, *inter alia*, for fraud, breach of express warranty, and unjust enrichment after contracting smoking-related illnesses); *Tab P'ship v. Grantland Fin. Corp.*, 866 F.Supp. 807, 811 n. 3 (S.D.N.Y. 1994) ("a court may consider the sophistication of a plaintiff investor in evaluating issues of inquiry notice, fraudulent concealment, and constructive knowledge because an investor's sophistication affects the extent to which a court may properly conclude that a particular event should have influenced that investor to inquire into the likelihood of fraud involving his or her investment"); *Kinley Corp. v. Integrated Resources Equity Corp.*, 851 F.Supp. 556, 568 (S.D.N.Y. 1994) ("The Plaintiffs' sophistication in financial matters can be considered in determining when inquiry notice was triggered."); *Marlow v. Gold*, No. CV 89-8589 (JSM), 1991 WL 107268, *1 (S.D.N.Y. June 13, 1991) (emphasizing that plaintiff was a sophisticated rather than a "stereotypical naive" investor); *Zola v. Gordon*, 685 F.Supp. 354, 370 n. 18 (S.D.N.Y. 1988) (noting the educational level and investment sophistication of plaintiffs).

Herremans' allegation that she was told the water pump problem was fixed following the first repair, coupled with her allegation that she is unsophisticated about automobiles, suffices at this stage of the proceedings to invoke the delayed discovery rule.  The fact that the water pump had failed only once as of February 2011, and the fact that Herremans was allegedly told that the repair had fixed the problem, could have caused an unsophisticated consumer not to suspect a defect and therefore not to investigate whether there was a defect in the automobile.  See *In re MyFord Touch Consumer Litig.*, 2014 WL 2451291 at *11 ("a single problem with MFT did not establish that there was a systemic problem with the system"); *Chamberlan*, 369 F.Supp.2d at 1148 ("The mere fact that a consumer's manifold failed does not necessarily mean that that person should have discovered Defendant's alleged non-disclosure at that time"); *Fox*, 35 Cal.4th at 807 (plaintiff must have reason to suspect that a cause of action exists).

---

[46]*Id.*, ¶ 61.

The court agrees with BMW that Herremans' allegation that the water pump failed "prematurely"[47] undercuts this conclusion somewhat.  Although the complaint does not allege how quickly a water pump must fail for the failure to be "premature," a "premature" failure might well be sufficient to put even an unsophisticated consumer on notice that she should investigate whether her car has a defect.  How premature the initial failure of Herremans' water pump was, and to what extent the timing of the failure should have put a consumer with Herremans' level of sophistication on notice are the types of fact questions that cannot be resolved in the context of a motion to dismiss, however.  Although the issue is a close one, the court concludes that, despite certain of the competing inferences the pleading raises, Herremans has, at least at this stage of the litigation, adequately alleged that she acted with reasonable diligence in discovering the water pump defect, and that she is entitled to the benefit of the delayed discovery rule.[48]  See *Falk*, 496 F.Supp.2d 1100 (concluding that plaintiffs' claims were not barred by the statute of limitations, "at least at the pleading stage").

The court therefore declines to dismiss Herremans' complaint at present as time-barred.  If subsequent discovery reveals that Herremans had reason to be aware of the defect at an earlier

---

[47]SAC, ¶ 77.

[48]BMW's reliance on *Stickrath v. Globalstar, Inc.*, No. CV 07-1941 THE, 2008 WL 5384760, *6 (N.D. Cal. Dec. 22, 2008), is misplaced.  There, and in contrast to the automobile defects at issue in *Falk* and *Chamberlan*, "Stickrath was immediately on notice of his phone's poor functioning upon purchase[;] . . . it was patently obvious" that the phone was defective.  *Id*. Although Globalstar possessed more technical knowledge of the cause of the failed calls, "the malfunctioning of the phone was apparent to a casual consumer/user."  *Id*.  Stickrath's deposition testimony "demonstrate[d] th[at] to be the case, as he rapidly realized the phone did not work.  That he lacked technical knowledge of the cause of his phone's defective operation does not mean he lacked knowledge of the phone's defects."  *Id*.  Here, Herremans alleges that she was unsophisticated about automobiles, and was told that the first repair had fixed the problem.  The alleged defect simply was not "patently obvious" as was the defect with the telephone in *Stickrath*. The court therefore find the case inapposite.

1   point in time, or that she failed to exercise reasonable diligence, BMW may raise its statute of

2   limitations defense in a future motion on a more fully developed factual record.[49]

3        **C.    Whether Herremans States a CLRA, UCL, or Fraud Claim**

4             **1.    Legal Standard Governing CLRA Claims**

5        The CLRA makes illegal various "unfair methods of competition and unfair or deceptive

6   acts or practices undertaken by any person in a transaction intended to result or which results in

7   the sale or lease of goods or services to any consumer." CAL. CIV. CODE § 1770(a).  Conduct

8   that is "likely to mislead a reasonable consumer" violates the CLRA.  *Colgan v. Leatherman Tool*

9   *Group, Inc.*, 135 Cal.App.4th 663, 680 (2006) (quoting *Nagel v. Twin Laboratories, Inc.*, 109

10  Cal.App.4th 39, 54 (2003)).   A "reasonable consumer" is an "ordinary consumer acting

11  reasonably under the circumstances," who "is not versed in the art of inspecting and judging a

12  product, [or] in the process of its preparation or manufacture. . . ." *Id*. (citing 1A CALLMANN

13  ON UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 5:17 (4th ed. 2004)).

14

15        [49]In her opposition to BMW's motion to dismiss the first amended complaint, Herremans

16  also argued that BMW "actively concealed" the defect at the time of purchase and thereafter;

17  specifically, she asserted that it concealed the defect from her when she first brought the car in

    for repairs because it assured her the problem had been fixed.  "[W]hen the defendant is guilty

18  of fraudulent concealment of the cause of action the statute [of limitations] is deemed not to

    become operative until the aggrieved party discovers the existence of the cause of action." *Unruh-*

19  *Haxton v. Regents of University of California*, 162 Cal.App.4th 343, 367 (2008) (quoting *Pashley*

20  *v. Pacific Elec. Ry. Co.* 25 Cal.2d 226, 229 (1944) (alterations original)).  "A defendant's fraud

    in concealing a cause of action against him will toll the statute of limitations, and that tolling will

21  last as long as a plaintiff's reliance on the misrepresentations is reasonable." *Grisham v. Philip*

22  *Morris U.S.A., Inc.*, 40 Cal.4th 623, 744 (2007).    The court found Herremans' active

    concealment allegations insufficient, however, because she did not allege (1) when she discovered

23  the defect, (2) any affirmative act of fraud intended to deter her from filing a claim, or (3) facts

24  suggesting that the authorized dealer who repaired her car was an agent of BMW.  (Order at 10-

    14.)  Herremans does not advance a similar argument in her opposition to BMW's motion to

25  dismiss the second amended complaint; the court therefore assumes she has abandoned it.  To the

    extent Herremans intended to plead that fraudulent concealment tolled the statute of limitations,

26  the court must dismiss the CLRA and fraud claims once again, as her allegations of concealment

    in the second amended complaint are identical to those in her first amended complaint. (Compare

27  FAC, ¶¶ 46-51 with SAC, ¶¶ 52-57.)  Thus, they fail for the reasons articulated in the court's

28  earlier order.  (See Order at 10-14.)

Section 1770(a)(4) bans the use of "deceptive representations . . . in connection with goods or services." Section 1770(a)(5) prohibits "[r]epresenting that goods or services have . . . characteristics, ingredients, uses, benefits, or quantities which they do not have. . . ." In addition, § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another." Finally, Section 1770(a)(9) bans "[a]dvertising goods or services with intent not to sell them as advertised." These sections of the CLRA encompass deceptive omissions as well as deceptive representations. *Mui Ho v. Toyota Motor Corp.*, No. 12–2672 SC, 2013 WL 1087846, *6 (N.D. Cal. Mar. 14, 2013) (citing *Daugherty v. American Honda Motor Company Inc.*, 144 Cal.App.4th 824, 835 (2006)). The CLRA is "liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." *Colgan*, 135 Cal.App.4th at 680.

### 2. Legal Standard Governing UCL Claims

"Unfair competition" under the UCL includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." *Id.*, § 17200. The California Supreme Court has construed the term broadly. See *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 180 (1999) ("[Section 17200] defines 'unfair competition' to include any unlawful, unfair or fraudulent business act or practice. . . . Its coverage is sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law. . . . By proscribing any unlawful business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable. . . . However, the law does more than just borrow. The statutory language referring to any unlawful, unfair or fraudulent practice . . . makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law. Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition – acts or practices which are unlawful, or unfair, or fraudulent" (internal quotations omitted)); see also *Paulus v. Bob Lynch Ford, Inc.*, 139 Cal.App.4th 659, 676-77 (2006) ("The purpose of the UCL 'is to protect both consumers and

competitors by promoting fair competition in commercial markets for goods and services. . . .' Thus, the scope of the UCL (Bus. & Prof. Code, § 17200 et seq.) is 'broad.' It 'covers a wide range of conduct'" (citations and footnote omitted)).

### 3. Legal Standard Governing Fraud Claims

To plead a fraud claim, a party must allege (1) a knowingly false representation or fraudulent omission by the defendant; (2) an intent to deceive or induce reliance; (3) justifiable reliance by the plaintiff; and (4) resulting damages. See, e.g., *Small v. Fritz Cos., Inc.*, 30 Cal.4th 167, 173 (2003) (stating that in California, fraud claims have five elements: "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage"); *Croeni v. Goldstein*, 21 Cal.App.4th 754, 758 (1994) ("To plead a cause of action for fraud the plaintiff must allege (1) a knowingly false representation by the defendant, (2) an intent to defraud or to induce reliance, (3) justifiable reliance, and (4) resulting damages"); see also *City Solutions Inc. v. Clear Channel Communications, Inc.*, 365 F.3d 835, 839 (9th Cir. 2004).

### 4. Whether Herremans Has Adequately Pled CLRA, UCL, and Fraud Claims[50]

BMW previously moved to dismiss Herremans' CLRA, fraud, and UCL claims on the grounds that she had failed to allege the circumstances constituting fraud with the particularity required by Rule 9(b), that she had failed to allege facts demonstrating that BMW had a duty to disclose the water pump defect, and that she had failed adequately to allege reliance. The court rejected BMW's argument that Herremans had not satisfied Rule 9(b) and that Herremans had failed to allege reliance adequately. The court agreed, however, that she had failed to allege a

---

[50]BMW attacks Herremans' pleading of the CLRA, UCL, and fraud claims in tandem based on her failure to plausibly allege knowledge. (Motion at 16.)

duty to disclose because she failed plausibly to plead that BMW had knowledge of the purported defect.[51]

Herremans predicates her CLRA, UCL, and fraud claims on BMW's allegedly knowing and intentional failure to disclose to class members that, as a result of the water pump defect, the class vehicles were "defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use."[52] She also contends that BMW's failure to disclose the defect was equivalent to a representation that the class vehicles were "of a particular standard, quality, or grade" when they were of another, and that when BMW advertised the class vehicles, it did not intend to sell them as advertised.[53] Herremans asserts that BMW's unfair and deceptive acts occurred repeatedly and were thus capable of deceiving a substantial portion of the purchasing public.[54]

As the court explained in its prior order, "[u]nder California law, there are four circumstances in which an obligation to disclose may arise: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant ha[s] exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *Smith v. Ford Motor Co.*, 749 F.Supp.2d 980, 987 (N.D. Cal. 2010) (citing *Limandri v. Judkins*, 52 Cal.App.4th 326, 337 (1997)); see also *Cirulli v. Hyundai Motor Co.*, No. SACV 08-0854 AG (MLGx), 2009 WL 5788762, *3 (C.D. Cal. June 12, 2009) ("In *Falk*, the Northern District of California found that concealment or a failure to disclose can constitute actionable fraud under the CLRA in four situations: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the

[51]Order at 15-37.

[52]SAC, ¶ 77.

[53]*Id.*, ¶ 75.

[54]*Id.*, ¶ 76.

plaintiff; and (4) when the defendant makes partial representations but also suppresses some material fact," citing *Falk*, 496 F.Supp.2d 1088 (quoting *Limandri*, 52 Cal.App.4th at 327)).[55]

Herremans contends only that BMW had exclusive knowledge of material facts that it actively concealed from her and other putative class members.[56]  To support a failure to disclose claim, the facts within BMW's knowledge must have been material.  See, e.g., *Ostreicher v. Alienware Corp.*, 544 F.Supp.2d 964, 970-71 (N.D. Cal. 2008) (citing the *Limandri* factors and stating that "[t]he first condition is not in issue here.  [A]ll of the other situations require materiality"), aff'd, 322 Fed. Appx. 489 (9th Cir. Apr. 2, 2009) (Unpub. Disp.).  "[I]n order for non-disclosed information to be material, a plaintiff must show that 'had the omitted information been disclosed, one would have been aware of it and behaved differently.'"  *Ostreicher*, 544 F.Supp.2d at 971 (quoting *Falk*, 496 F.Supp.2d at 1095 (in turn quoting *Mirkin v. Wasserman*, 5 Cal.4th 1082, 1093 (1993))).  As noted, "[m]ateriality . . . is judged by the effect [of the information] on a 'reasonable consumer.'"  *Id.* (citing *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal.App.4th 1351, 1360 (2003)).

"[W]here, as here, a plaintiff's claim is predicated on a manufacturer's failure to inform its customers of a product's likelihood of failing outside the warranty period, the risk posed by such asserted defect cannot be 'merely' the cost of the product's repair . . . ; rather, for the omission to be material, the failure must pose 'safety concerns.'"  *Smith*, 749 F.Supp.2d at 987 (citing *Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal.App.4th 824, 835-38 (2006)).  "In other words, under California law, and as recently described by the Ninth Circuit: 'A manufacturer's duty to consumers is limited to its warranty obligations absent either an affirmative misrepresentation or a safety issue.'"  *Id.* at 987-88 (citing *Oestriecher*, 322 Fed. Appx. at 493) (affirming the dismissal of CLRA, UCL and fraudulent concealment claims because plaintiff failed to allege that defendant had 'affirmatively misrepresented its products' or that the alleged defect 'posed a threat to his own safety or the safety of others')); see also *id.* at 987 ("The California

---

[55]Order at 22.

[56]Opposition at 11; see SAC, ¶¶ 49-51.

Court of Appeal has held that a manufacturer cannot be found liable under the CLRA for failure to disclose a defect that manifests itself after expiration of the warranty period unless such omission (1) is 'contrary to a representation actually made by the defendant' or (2) pertains to a 'fact the defendant was obligated to disclose,'" quoting *Daugherty*, 144 Cal.App.4th at 835-36).

Such rule is consistent with the policies underlying California warranty law.  As noted in *Daugherty*:

> "[V]irtually all product failures discovered in automobiles after expiration of the warranty can be attributed to a 'latent defect' that existed at the time of sale or during the term of the warranty.  All parts will wear out sooner or later and thus have a limited effective life.  Manufacturers always have knowledge regarding the effective life of particular parts and the likelihood of their failing within a particular period of time. . . .  [M]anufacturers . . . can always be said to 'know' that many parts will fail after the warranty period has expired.  A rule that would make failure of a part actionable based on such 'knowledge' would render meaningless time/mileage limitations on warranty coverage."  *Daugherty*, 144 Cal.App.4th at 830-31 (quoting *Abraham v. Volkswagen of Am., Inc.*, 795 F.2d 238, 250 (2d Cir. 1986) (alterations original)).

"Indeed, as noted by the district court in *Oestreicher*, 'the purpose of a warranty is to contractually mark the point in time during the useful life of a product when the risk of paying for repairs shifts from the manufacturer to the consumer.'"  *Smith*, 749 F.Supp.2d at 988 (citing *Oestreicher v. Alienware Corp.*, 544 F.Supp.2d 964, 972 (N.D. Cal. 2008), and *Abraham*, 795 F.2d at 250).

"[T]he rule set forth in *Daugherty* is consistent with the general policy stated by the California Supreme Court that although '[a] consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market,' the consumer nevertheless 'can . . . be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will.'"  *Id.* at 988 (citing *Seely v. White Motor Co.*, 63 Cal.2d 9, 18 (1965)); see also *Berenblat v. Apple Inc.*, Nos. 08-4969 JF

(PVT), 09-1649 JF (PVT), 2009 WL 2591366, *5-7 (N.D. Cal. Aug. 21, 2009) (dismissing claims based on an allegedly defective computer component, because "[t]he failure to disclose a defect that might, or might not, shorten the effective life span of [a product] that functions precisely as warranted throughout the terms of the express warranty" is not actionable); *Morgan v. Harmonix Music Systems, Inc.*, No. CV 08-5211 BZ, 2009 WL 2031765, *4 (N.D. Cal. July 7, 2009) (dismissing claims based on allegedly defective video game drum pedals because "[a]ccording to all of the relevant case law, defendants are only under a duty to disclose a known defect in a consumer product when there are safety concerns associated with the product's use"); *Wilson v. Hewlett Packard Co.*, No. C-09-2253 RMW, 2009 WL 3021240, *1 (N.D. Cal. Sept. 17, 2009) (dismissing a CLRA claim based on a manufacturer's alleged duty to disclose where the omission did not implicate safety concerns); *Hoey v. Sony Electronics, Inc.*, 515 F.Supp.2d 1099, 1105 (N.D. Cal. 2007) (finding that "[t]here is no authority that provides that the mere sale of a consumer electronics product in California can create a duty to disclose any defect that may occur during the useful life of the product").

In dismissing the first amended complaint, the court found that Herremans had adequately alleged that the purported water pump defect posed a safety hazard, and that she had adequately alleged reliance, but that she had failed to plead facts plausibly suggesting that BMW knew of the purported water pump defect.[57]   The question, therefore, is whether Herremans has now sufficiently alleged that BMW had exclusive knowledge of the defect and thus had a duty to disclose under the CLRA and UCL.[58]   To answer this question, the court must assess whether,

---

[57]Order at 24-30 (safety hazard); *id*. at 36-37 (reliance).

[58]Herremans alleges that BMW had knowledge of the defect on information and belief. Alleging knowledge of falsity or knowledge of a material, undisclosed fact on information and belief is not prohibited.  Rather, where a fact is peculiarly within the defendant's knowledge, it can be alleged on information and belief so long as facts supporting the belief are alleged.  See, e.g., *Apodaca v. Whirlpool Corp.*, No. SACV 13–00725 JVS (ANx), 2013 WL 6477821, *4 (C.D. Cal. Nov. 8, 2013) ("[T]hough allegations based on information and belief are usually insufficient [under Rule 9(b)], in circumstances of corporate fraud, this rule may be relaxed as to matters within the opposing party's knowledge"); *United States ex rel. Mason v. State Farm Mut. Auto. Ins. Co.*, No. CV07–297–S–EJL, 2008 WL 2857372, *13 (D. Idaho July 23, 2008) ("[A]

under Rule 8(a), her allegations plausibly plead that BMW knew of the defect prior to her purchase of a Mini-Cooper. In its prior order, the court applied the Ninth Circuit's reasoning in *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136 (9th Cir. 2012), and concluded that Herremans' allegations were insufficient to satisfy Rule 8(a).[59]

In *Wilson*, plaintiffs asserted CLRA and UCL claims against Hewlett-Packard ("HP"), alleging that it had concealed a design defect in its laptop computers that manifested after the expiration of the warranty period and created an unreasonable safety hazard. *Wilson*, 668 F.3d at 1138. Plaintiffs asserted that HP knew of the defect prior to the date they commenced their action, citing, *inter alia*, the fact that it had access to "aggregate information and data regarding the risk [that the laptops would] overheat[ ]," that consumer complaints had been filed, and that HP "became familiar with" and had been "on notice" of the defect at the time of manufacture and as early as 2002. *Id.* at 1146-47.[60]

The court noted that the allegations that HP was "on notice" and was "familiar with" the defect were deficient because they were "merely conclusory." *Id.* at 1147. It found plaintiffs' allegation that HP had "aggregate information and data regarding the risk of overheating" speculative because it did not suggest how tests or information would have alerted HP to the defect. *Id.* Finally, the court considered plaintiffs' allegations regarding HP's knowledge of consumer complaints. *Id.* It noted that plaintiffs had submitted fourteen customer complaints, but did not indicate where or how they were made – i.e., whether they were submitted directly to HP

---

lenient application of Rule 9(b) is allowed 'in a limited class of corporate fraud cases where the evidence of fraud is within a defendant's exclusive possession.' In such cases, a complaint based on information and belief is sufficient if it includes a statement of facts upon which the belief is based"). Because what BMW knew is a matter peculiarly within its possession, Herremans' allegation of knowledge on information and belief will be sufficient if supported by the pleading of adequate facts.

[59]Order at 30-35.

[60]The court also noted that plaintiffs alleged the laptops' "Design for Reliability" was inadequate. *Id.* at 1146-47. The opinion does not describe a "Design for Reliability," and states only that this "generalized assertion" was inadequate because it referenced "neither the specific defect . . . nor HP's knowledge of that defect." *Id.* at 1147.

or posted on a general website. *Id.* at 1147-48. Twelve of the complaints were undated; two bore dates that were more than two years after plaintiffs purchased their laptops. *Id.* at 1148. Noting that "courts have rejected undated customer complaints offered as a factual basis for a manufacturer's knowledge of a defect because they provide no indication whether the manufacturer was aware of the defect at the time of sale," *id.* at 1147, the court distinguished *Falk* on the basis that the court there had considered "the amassed weight of [customer] complaints" together with other indications that GM had knowledge of the defect" in denying a motion to dismiss. *Id.* Because the consumer complaints Wilson had submitted did not demonstrate HP's knowledge of the defect at the time he purchased his laptop, the court affirmed the district court's dismissal. *Id.* at 1148.

As it did in its motion to dismiss the first amended complaint, BMW argues that *Wilson* compels dismissal of Herremans' CLRA and UCL claims as alleged in the second amended complaint. It asserts that she offers conclusory allegations concerning its knowledge that are virtually indistinguishable from those the *Wilson* court held were insufficient, and that she fails to provide any meaningful factual foundation for her conclusion that it knew of the defect.[61] In the second amended complaint, Herremans alleges, on information and belief, that "BMW, through its own internal testing, records of customer complaints, dealership repair records, and other internal sources, was well aware and knew of the Water Pump Defect prior to BMW distributing the Class Vehicles to Mini Cooper dealerships."[62] The complaint alleges that consumers have made "numerous . . . complaints" about the defect to both BMW and NHTSA.[63] As the court previously explained, many of Herremans' allegations are similar to the allegations

---

[61]Motion at 16.

[62]SAC, ¶ 37.

[63]*Id.*, ¶ 15.

in *Wilson* – they are vague, conclusory, and fail plausibly to allege BMW's knowledge of the defect.

Herremans' allegation that BMW "was well aware and knew" of the defect prior to distributing the class vehicles in 2006 is conclusory.[64] Her general reference to "internal testing, records of customer complaints, dealership repair records, and other internal sources" provides little, if any, factual foundation for her conclusion that BMW knew of the defect. Herremans does not describe the internal testing or what it shows. She does not identify the repair records, their volume, or how they revealed the defect. She provides no detail concerning the customer complaints, when they were submitted, what they said, or how many came directly to BMW and how many went to NHTSA. Finally, she offers no information concerning the "other internal sources" she references.

In other paragraphs of the complaint, Herremans references "pre-release testing data, warranty data, customer complaint data, and replacement part sales data" as "other internal sources of aggregate information about the problem."[65] This allegation is similarly conclusory because it does not plausibly indicate that BMW knew of the defect prior to the time it distributed the class vehicles. See *Wilson*, 668 F.3d at 1147 ("The allegation that HP, as the manufacturer, had 'access to the aggregate information and data regarding the risk of overheating' is speculative and does not suggest how any tests or information could have alerted HP to the defect").

Although Herremans asserts BMW knew of the defect in 2006 "before [it] distribut[ed] the class vehicles," she alleges no facts as to when the pre-release testing she references took place,

---

[64]Herremans does not explain how BMW could have "data from dealers regarding repairs and replacement parts" and "early consumer complaints" about the water pump defect prior to distributing class vehicles to Mini Cooper dealerships. It may be she alleges that the defect was present in earlier model year vehicles; she does not state this, however, or allege when BMW purportedly received repair and replacement data, what that data was, or how it put BMW on notice that there was a water pump defect in the class vehicles. If her reference is to earlier model year cars, she does not state that the water pump design in the class vehicles was identical to that of earlier Mini-Coopers.

[65]SAC, ¶ 50.

when consumer complaints were received, or when warranty data and dealer repair records began to reflect problems with the mechanical water pump.[66]  As in *Wilson*, absent additional facts, Herremans' references to internal information and external customer complaints does not plausibly plead knowledge because they give no sense of chronology – the complaint does not indicate when BMW purportedly received information or complaints, nor how they put it on notice of the defect in 2006.  See *id.* (noting that "undated customer complaints . . . provide no indication whether the manufacturer was aware of the defect at the time of sale").

In short, as they did previously, these allegations fall short of allegations in other cases that courts have found satisfactory.  See, e.g., *Falco v. Nissan North America, Inc.*, No. CV 13-00686 DDP (MANx), 2013 WL 5575065, *6-7 (C.D. Cal. Oct. 10, 2013) ("Plaintiffs have alleged particular facts which makes Plaintiffs' allegations more than merely speculative or conclusory. First, as noted above, Plaintiffs allege that on or around July 17, 2007, NNA issued the first of several Technical Service Bulletins to its dealerships instructing technicians to replace components of the Timing Chain Tensioning System in the vehicles covered by the complaint.  Second, Plaintiffs allege that in or around 2006 or 2007, NNA replaced the chain guide of the Time Chain Tensioning System with a redesigned version of the part that does not suffer from the defect. These facts, if true, permit plausible inferences that NNA was aware of the defect at the time they sold the vehicles in 2005 and 2006 and that NNA acquired this knowledge through the sorts of internal data Plaintiffs allege. . . .  [D]efendants allegedly provided their dealers with a technical service informational bulletin acknowledging the headlight defect and noting the availability of replacement parts. . . .  NNA correctly points out that most of the alleged complaints to the NHTSA occurred post-sale, including those explicitly raising safety concerns.  Were post-sale customer complaints the only basis for NNA's alleged knowledge at the time of sale, . . . NNA would have a stronger case.  But . . . there are other adequate bases to permit an inference that

---

[66]*Id.*, ¶ 37 ("BMW, through its own internal testing, records of customer complaints, dealership repair records, and other internal sources, was well aware and knew of the Water Pump Defect prior to BMW distributing the Class Vehicles to Mini Cooper dealerships"); see also *id.*, ¶ 50.

NNA was aware of the alleged defect at the time of sale"); *Avedisian v. Mercedes-Benz USA LLC*, CV 12-00936 DMG (CWx), 2013 WL 2285237, *1, 7 (C.D. Cal. May 22, 2013) (holding that customer complaints sufficiently established defendant's knowledge of the defect at the time of plaintiff's purchase because plaintiff produced copies of consumer complaints with specific dates); Compare *Baba v. Hewlett-Packard Co.*, No. C 09-05946 RS, 2010 WL 2486353, *4-5 (N.D. Cal. June 16, 2010) (holding that none of the consumer complaints alleged in the complaint "include[d] any dates, and therefore shed no light on when HP knew of the alleged defects"); *Oestreicher*, 544 F.Supp.2d at 974 n.9 ("Random anecdotal examples of disgruntled customers posting their views on websites at an unknown time is not enough to impute knowledge upon defendants. There is no allegations that Alienware knew of the customer complaints at the time plaintiff bought his computer").

Herremans also alleges that BMW knew of the defect before it distributed the class vehicles because it introduced a redesigned water pump in 2012.[67] The court previously found that the gap between the redesign of the water pump in 2012 and Herremans' purchase of her vehicle in 2008 was simply too great plausibly to suggest that BMW knew of the water pump defect in 2008. It noted that in another case, *Falco*, the introduction of a redesigned part came approximately one year after plaintiffs purchased their vehicles. The court held that this, in combination with other facts alleged suggesting knowledge, plausibly gave rise to an inference that the manufacturer knew of the purported defect when it sold plaintiffs' vehicles. See *Falco*, 2013 WL 5575065 at *7 (allegations that defendants introduced a replacement part approximately one year after plaintiffs purchased their cars, in tandem with other allegations suggesting knowledge, "permit[ted] the plausible inferences that NNA was aware of the defect at the time theat they sold the vehicles" to plaintiffs). Notably, in *Falco*, plaintiffs alleged that the manufacturer had issued Technical Service Bulletins ("TSB") prior to the redesign, which plausibly suggested defendants knew of the defect; this was adequate to support an inference that it was working to redesign it. Herremans' amended complaint contained no similar allegations or facts supporting a reasonable

---

[67]See *id.*, ¶ 17-18.

inference that, because BMW introduced a redesigned water pump in 2012, it knew of the purported defect six years earlier in 2006 or four years earlier in 2008.  The court thus found that Herremans had failed adequately to allege knowledge, and that her claims were subject to dismissal.

In her second amended complaint, Herremans alleges that BMW issued a TSB prior to the 2012 redesign.  Specifically, she contends that BMW issued a TSB concerning the water pump defect in December 2009, and that this evidences its knowledge of the defect.[68]  BMW disputes that the December 2009 TSB, issued thirteen months after Herremans purchased her vehicle in November 2008, demonstrates that it had knowledge of the water pump defect at the time she bought her car.[69]  Citing *American Honda Motor Co. v. Superior Court*, 199 Cal.App.4th 1367, 1378 (2011), BMW contends first that "California law is unambiguous" that "a TSB is not evidence of a defect."[70]  *American Honda*, however, does not stand for the proposition that a TSB cannot serve as evidence of *knowledge* of a defect; it simply holds that "[a] technical service bulletin is not and cannot fairly be construed by a trial court as an admission of a design or other defect."  *Id.*

BMW also cites several decisions from the District of New Jersey, in which courts hesitated to conclude that a manufacturer knew of a defect simply because it issued a TSB.  See *Wiseberg v. Toyota Motor Corp.*, No. CV 11-3776 JLL, 2012 WL 1108542, at *4 (D.N.J. Mar. 30, 2012) ("[T]his Court has previously expressed hesitation in viewing TSBs or other advisories as potential admissions of fraudulent concealment of a defect, because 'such advisories are generally the result of consumer complaints that cause a manufacturer to investigate, diagnose, and remedy a defect in one of its products.  Accepting these advisories as a basis for consumer fraud claims may discourage manufacturers from responding to their customers in the first place,'" citing *Alban v. BMW of North America,* No. CV 09-5398 DRD, 2011 WL 900114,

---

[68]SAC, ¶ 16.

[69]Motion at 17.

[70]*Id.*

1  *36–37 (D.N.J. Mar.15, 2011); *Glass v. BMW of North America, LLC,* No. CV 10-5259 ES,

2  2011 WL 6887721, *8 n. 11 (D.N.J. Dec. 29, 2011)).

3       This authority does not bind the court, and is contrary to several reported California district

4  court decisions.  See *MacDonald v. Ford Motor Co.*, No. CV 13-02988 JST, 2014 WL 1340339,

5  *4 (N.D. Cal. Mar. 31, 2014) ("One plausible inference that can be drawn from the three TSBs

6  is that Ford was generally aware of problems with the coolant pump, and that despite this

7  awareness it continued to sell vehicles containing the defective part.  For instance, the second TSB

8  indicates that Ford was aware of defects in July 2008.  That plausibly suggests that it was aware

9  of some of those same defects when Plaintiff Barbee purchased his vehicle five months earlier");

10  *Falco*, 2013 WL 5575065 at *6 ("First, as noted above, Plaintiffs allege that on or around July

11  17, 2007, NNA issued the first of several Technical Service Bulletins to its dealerships instructing

12  technicians to replace components of the Timing Chain Tensioning System in the vehicles covered

13  by the complaint.  Second, Plaintiffs allege that in or around 2006 or 2007, NNA replaced the

14  chain guide of the Timing Chain Tensioning System with a redesigned version of the part that does

15  not suffer from the defect.  These facts, if true, permit plausible inferences that NNA was aware

16  of the defect at the time they sold the vehicles in 2005 and 2006 and that NNA acquired this

17  knowledge through the sorts of internal data Plaintiffs allege").  The court agrees with, and finds

18  the California district court decisions more persuasive.  As *Falco* and *Glass* make clear, TSBs can

19  constitute circumstantial evidence of knowledge if they are numerous and/or are issued sufficiently

20  close in time to a plaintiff's purchase of a purportedly defective vehicle; this is particularly true

21  where other allegations such as the redesign in *Falco* support an inference of knowledge.

22       The court concludes, however, that Herremans' allegations, including her allegations

23  concerning the issuance of a TSB in 2009, do not adequately plead BMW's knowledge.

24  Herremans alleges that she purchased her car on November 15, 2008,[71] that a single TSB

25  addressing a water pump defect was issued in December 2009,[72] and that BMW redesigned the

26  _____

27     [71]SAC, ¶ 20.

28     [72]*Id.*, ¶ 16.

water pump at some undisclosed time in 2012.[73]   There are no factual allegations plausibly suggesting that BMW knew of the water pump defect on November 15, 2008, more than a year before the TSB issued, and four years before the redesigned part was allegedly made available. This is particularly true since Herremans alleges no facts concerning the content of the December 2009 TSB; she merely alleges in conclusory fashion that it concerned what she has termed the water pump defect.   As a consequence, it is not possible to discern from her allegations the state of BMW's knowledge in December 2009, and thus not possible to infer that it must have known of problems with the water pump when she purchased her vehicle in November 2008.

For these reasons, defendants are correct that as currently alleged, Herremans has offered no more than "a sheer possibility that [BMW] has acted unlawfully." *Iqbal*, 556 U.S. at 678. She has alleged conclusory statements and facts that are "'merely consistent with' [BMW's] liability" and "stop[ped] short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Herremans cites various decisions that she contends demonstrate the sufficiency of her allegations; each is inapposite, however.   In *MacDonald*, plaintiffs asserted an array of facts to support their claim that Ford knew of a coolant pump defect in its vehicles.   They alleged that Ford had released *three* relevant TSBs detailing problems with the coolant pump.   One TSB was issued *before* plaintiffs purchased their vehicles; another issued a mere five months after the purchase, and the third only nine months after her purchase. *MacDonald*, 2014 WL 1340339 at *4.   The court concluded that "taken together," the TSBs supported a plausible inference of knowledge. *Id.*   In this case, Herremans alleges the existence of a single TSB that was issued more than a year after the vehicle purchased.   Given this timing, and the fact that Herremans does not allege anything concerning the content of the TSB that would suggest knowledge at the time she purchased her vehicle, *MacDonald* does not support an inference of knowledge.

Herremans' reliance on *Falco* is equally unavailing.   There, plaintiff cited a series of three TSBs issued by Nissan that explicitly instructed dealers to replace an allegedly defective engine

---

[73]*Id.*, ¶ 41.

part.  Plaintiff also cited various pre-sale NHTSA complaints concerning the purported engine defect.  The court considered the three TSBs in combination with "other adequate bases" and determined that the complaint sufficiently pled facts giving rise to a plausible inference of knowledge.  *Falco*, 2013 WL 5575065 at *6.  The *Falco* court made clear that *pre-sale* customer complaints were critical to its finding that plaintiff adequately alleged knowledge.  See *id.* at *7 ("Were post-sale customer complaints the only basis for NNA's alleged knowledge at the time of sale, . . . NNA would have a stronger case," citing *Grodzitsky v. Am. Honda Motor Co.*, No. CV 12-1142 SVW PLA, 2013 WL 690822, *7 (C.D. Cal. Feb. 19, 2013) ("Nor can Plaintiffs establish a plausible inference of knowledge based on their allegation that Defendant received customer complaints *after* the sales of the vehicles in question.")).  Here, Herremans alleges that BMW issued a single TSB more than a year after she purchased her vehicle.  Although she pleads that BMW received customer complaints, she does not detail when the complaints were received nor when NHTSA received complaints about the water pump defect.  Consequently, her reliance on *Falco* is unavailing.[74]

---

[74]Herremans also cites *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F.Supp.2d 1220, 1240 (C.D. Cal. 2011), *Ehrlich v. BMW of N. Am., LLC*, 801 F.Supp.2d 908, 918-19 (C.D. Cal. 2010), and *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 754 F.Supp.2d 1145, 1192 (C.D. Cal. 2010), as support for her argument that she has pled knowledge adequately.  These cases are also inapposite.  The issue before the court in *Cholakyan* was not whether plaintiff had adequately pled knowledge for purposes of a claim based on failure to disclose, but rather whether the TSBs indicated the purported defect could cause a safety risk and whether they reflected that a "secret warranty program" existed.  See *Cholakyan*, 796 F.Supp.2d at 1236 (noting that Cholakyan relied on a statement in the TSB that "'water entry in the driver/front passenger foot well' is, or may be, 'in some cases accompanied with electrical faults due to water in the control units. . . ,'" in alleging "that the Class Vehicles present[ed] a safety hazard and [were] unreasonably dangerous to consumers, because 'of the danger of catastrophic engine and/or electrical system failure as a result of water entering and flooding a vehicle's interior cabin while the vehicle is in operation'"); *id.* at 1240 ("Here, Cholakyan alleges that the TSB was a secret warranty program, which extended class members' warranties beyond their original limits").  For its part, *Ehrlich* was decided before *Wilson*; as a result, other district courts have found it unpersuasive in light of the more recent Ninth Circuit decision.  See *Grodzitsky*, 2013 WL 690822 at *7 ("Plaintiffs argue that allegations 'nearly identical' to theirs were deemed sufficient to establish knowledge under the CLRA by the district courts in *Falk* and *Ehrlich;* however, those decisions were made before the Ninth Circuit's decision in *Wilson*").

1    Because Herremans does not adequately allege that BMW had knowledge of the purported

2    water pump defect prior to the time she purchased her vehicle, her CLRA and UCL claims are

3    deficiently pled and must be dismissed.  Further, because knowledge of falsity is a necessary

4    element of a fraud claim, Herremans' fraud claim must be dismissed for the same reason as her

5    CLRA and UCL claims.  See, e.g., *Small*, 30 Cal.4th at 173 (stating that in California, fraud

6    claims have five elements: "(a) misrepresentation (false representation, concealment, or

7    nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce

8    reliance; (d) justifiable reliance; and (e) resulting damage"); see also *City Solutions Inc. v. Clear*

9    *Channel Communications, Inc.*, 365 F.3d 835, 839 (9th Cir. 2004).

10        **D.    Whether the Court Should Grant Herremans Leave to Amend**

11        BMW argues that Herremans' complaint should be dismissed with prejudice because she

12   has had three opportunities to plead viable claims, and has failed to do so.  See *Telesaurus VPC,*

13   *LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010) ("A district court may deny a plaintiff leave

14   to amend . . . if plaintiff had several opportunities to amend its complaint and repeatedly failed

15   to cure deficiencies.").  It contends the court has already given Herremans detailed instructions

16   concerning what she must plead to allege delayed discovery and BMW's knowledge of the water

17   pump defect, and that her failure to correct the deficiencies indicates she cannot plead sufficient

18   factual detail to state a plausible claim for relief.

19        BMW is correct that Herremans has filed three complaints; this is only the second time,

20   however, that the court has passed on the sufficiency of her allegations.  Although, for the reasons

21

22   ───────────────

23   Finally, *Toyota* is another pre-*Wilson* decision.  It concluded that plaintiff had pled a plausible
     inference of knowledge on far more specific allegations than those at issue here.  See 754

24   F.Supp.2d at 1192 (finding that a complaint supported an inference of knowledge where plaintiff
     alleged NHTSA's findings of a 400% increase in "Vehicle Speed" complaints in Camrys with

25   an electronic throttle control system, 37,000 concealed consumer complaints, secret Field
     Technical Reports and Dealership Reports, issues with the electronic throttle actuator assemblies

26   shared only with dealers and later NHTSA, eliminated references to speed control problems,
     concealed "surging" complaints, and an increased number of consumer complaints post-recall,

27   which demonstrated the problem had not been corrected by Toyota).  These cases therefore do not

28   support inferring knowledge on the facts alleged in the second amended complaint.

stated herein, the court concludes that Herremans has not alleged viable claims against BMW, she did plead sufficient facts to invoke the delayed discovery rule, and moved incrementally closer to stating a claim.  As a result, the court cannot conclude there is no possibility that she can amend to allege facts supporting the application of the delayed discovery rule and to plead BMW's knowledge of the water pump defect sufficiently.  The court therefore grants Herremans leave to amend.  See *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051 (9th Cir. 2008) ("Dismissal without leave to amend is proper if it is clear that the complaint could not be saved by amendment"); *California ex rel. California Department of Toxic Substances Control v. Neville Chemical Co.*, 358 F.3d 661, 673 (9th Cir. 2004) ("[D]enial of leave to amend is appropriate if the amendment would be futile," citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Herremans is warned, however, that should she fail to plead the claims adequately in any third amended complaint, the court will likely find that further amendment would be futile and dismiss her claims with prejudice.

### III.  CONCLUSION

For the reasons stated, the court denies BMW's motion to dismiss to the extent premised on the statute of limitations.  The court grants BMW's motion to dismiss all of Herremans' claims for failure to plausibly allege that it had knowledge of the purported water pump defect.  Dismissal is with leave to amend.  Herremans may file an amended complaint that addresses the deficiencies noted herein within twenty (20) days of the date of this order.

Herremans may not plead new claims.  Should the scope of any amendment exceed the scope of leave to amend granted by this order, the court will strike the offending portions of the pleading under Rule 12(f).  See FED.R.CIV.PROC. 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.  The court may act: (1) on its own; or (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading"); see also

*Barker v. Avila*, No. 2:09-cv-0001-GEB-JFM, 2010 WL 31701067, *1-2 (E.D. Cal. Aug. 11, 2010) (striking an amendment to a federal law claim where the court had granted leave to amend only state law claims).

DATED: February 19, 2015

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE