there have been 1,572 cure letters to class members whose claim forms have been deemed deficient, and as of October 31, 2016, 190 cure responses have been received. Additional notices of deficiency will be mailed on November 14, 2016. (See, Haan Declaration, attached as exhibit 2 to Harris Declaration, ¶¶ 3-14; McNulty Declaration, attached as exhibit 3 to Harris Declaration, ¶ 6.)

Moreover, we estimate that the total value of the settlement is $4,584,765.34, to $6,728,768.83, including anticipated future claims, deficiencies which are cured, and future repair costs averted by virtue of the notice. (See, McNulty Declaration, ¶¶ 8-13; Harris Declaration, ¶¶ 19-22, 32.) This does not include the present and future cost of claims administration services of approximately $500,000.00. (Harris Declaration, ¶ 32.)

In contrast, there have been only 112 opt-outs and no objections, thus establishing that the class approves the settlement of the parties. (Haan Declaration, ¶¶ 10-11; Harris Declaration, ¶ 31.)

## II.

## FACTS AND PROCEDURE

### A. Named Plaintiff's Purchase of a Class Vehicle with Water Pump Defect

Plaintiff purchased a new 2009 Mini Cooper ("Vehicle") in November of 2008. (FAC ¶ 20.) This vehicle was distributed, advertised, marketed and warranted by BMW, and bears the Vehicle Identification No. MWMF73579TT95691. (*Id.*) In January of 2013, after a previous repair under warranty for the same problem, Herreman's Vehicle had to undergo a second repair due to the mechanical water pump leaking, and Herreman's paid $1,700 in connection with the repair. (FAC, ¶ 21.) BMW refused to pay for or reimburse Herreman's for the cost of these repairs. (FAC, ¶¶ 21-22.)

All Class Vehicles when purchased new came with a New Car Limited Warranty covering defects in the materials and workmanship for a period of 50,000 miles or four (4) years, whichever occurs first. (FAC, ¶ 47.)

### B. Class Members Similar Experience

BMW has furnished Plaintiff with information relating to mechanical water pump failures in California, where most Vehicles are sold. (Harris Declaration, ¶ 18.)

During October of 2006 to November of 2012, BMW utilized a thermoplastic housing on the water pump in the Class Vehicles. During this time-period, paid warranty and goodwill claims of California owners of Mini Vehicles (with plastic housing on the water pump) were approximately 7.5% all such Vehicles sold in California. In production years 2013 to 2014, after BMW began producing Class Vehicles with an alloy Water pump, Warranty claims for Mini vehicles relating to water pump failure plunged to approximately 1% of or less of vehicles sold in California.[1] To date, BMW has spent in California $3,800,374.28 in warranty and goodwill repairs associated with vehicles experiencing failure of the mechanical water pump. (This entails approximately 9,421 claims granted under warranty or good will.) (See, Harris Declaration, ¶¶ 19-20.)

Plaintiff estimates that BMW has paid a total of $6,867,411.72 nationwide for warranty and good will work associated with the water pump. The total number of repairs under this analysis is 17,024. (McNulty Declaration, ¶ 6, a.-b; Harris Declaration, ¶¶ 21-22.)

### C. Plaintiff's Allegations in FAC Regarding the Water Pump Defect

The Class Vehicles are equipped with the mechanical water pump, which circulates water throughout the engine. (FAC ¶¶ 3-4.) The mechanical water pump is bolted to the engine block. (*Id.*) The mechanical water pump contains a metal shaft.

---

[1] See *US. v. General Motors Corp.*, 518 F.2d 420, 427 (C.A.D.C. 1975) (defect exists where a significant (i.e., non-"de minimus") number of failures occur); *U.S. v. Ford Motor Corp.*, 453 F. Supp. 1240, 1243, 1246 (D. D.C. 1978) (finding existence of defect based on replacement-part sales data); *United States v. Ford Motor Co.*, 421 F. Supp. 1239, 1241-42 (D.D.C. 1976) (existence of defect based on warranty return rate of 2%); *United States v. General Motors Corp.*, 417 F. Supp. 933, 938 (D.D.C. 1976) (GM stipulates that 300 fires in population of 375,000 vehicles constituted a significant number on which to base finding of defect), aff'd, 565 F.2d 754 (D.C. Cir. 1977).

(*Id.*, ¶ 4.) One side of the metal shaft is connected to a pulley which is driven by the engine. The pulley spins, causing the metal shaft to spin. The other side of the metal shaft is connected to an impeller, which is used to circulate water throughout the engine. (*Id.*) A sealed bearing is used to connect the metal shaft to the rest of the mechanical water pump. The sealed bearing allows the metal shaft to spin while still being connected to the rest of the mechanical water pump, and acts as a barrier in order to prevent water from leaking from the mechanical water pump. (*Id.*)

The original mechanical water pump installed in the Class Vehicles used a two-row ball bearing system, with the ball bearings being encased in two ball bearing cages. The cages were then encased in a sealed bearing system. This bearing system would allow the metal shaft to spin, while the remainder of the mechanical water pump would remain bolted to the engine. This would in turn spin the impeller, which would circulate water throughout the engine. (*Id.*)

The amount of stress placed on the sealed bearing system by the drive pulley exceeds the engineering limitations of the two-row ball bearing design. As a result, the sealed two roll ball bearing system installed in the mechanical water pumps has experienced a very high failure rate, and is unreliable. When the two-row ball bearing system fails, the mechanical water pump leaks, makes noise, and the metal shaft can also stop rotating. (*Id.*)

When a mechanical water pump leaks a sufficient amount of water, or when the metal shaft stops spinning, this results in engine overheating "the Water Pump Defect". Regarding the mechanical water pumps leaking, and regarding the metal shaft ceasing, this poses a serious safety hazard, because if this problem is not remedied, it will result in an affected Class Vehicle's engine overheating. When an engine overheats while it is being driven, this results in catastrophic engine failure. Catastrophic engine failure while a Class Vehicle is being driven in traffic poses a serious safety hazard. When the engine of a Class Vehicle fails to function while the Class Vehicle is being driven in traffic, the affected Class Vehicle loses the

ability to accelerate. Furthermore, the affected Class Vehicle's steering and braking abilities are severely diminished, due to the power braking and power steering system not being able to properly function. (*Id.*, ¶¶ 5-6.)

BMW did not dispute the fact that the mechanical water pumps failed, but instead argued that this was due to the composition of the mechanical water pump. BMW states that a change of design in the pump, to use an alloy cover rather than a plastic one, was followed by the dramatic decline in the failure rate outlined above. (Harris Declaration, ¶¶ 6-8, 19-20.) Plaintiff hired an expert who agrees with BMW's assertions, but also opines that BMW changed the two-row ball bearing design critiqued by Plaintiff, and thereby further strengthened the new metal alloy water pump by adopting the new design. (Harris Declaration, ¶ 8.)

The Class Vehicles consist of MINI R55, R56, R57, R58, R59, and R60 vehicles, with a production date from October of 2006 through November 2012, as more fully described in the Agreement. (Agreement § I, ¶¶ 10-16.) Approximately 165,000 Class Vehicles were sold in California. (Harris Declaration, ¶¶ 5, 19-21.) The total Class Vehicles sold nationwide is 298,038. (Harris Declaration, ¶ 21.)

The costs of the Water Pump Defect to consumers can be and often are exorbitant, because consumers have been and will continue to be required to pay hundreds if not thousands of dollars both to diagnose and repair the damages caused by the Water Pump Defect. Additionally, the presence of the Water Pump Defect in the Class Vehicles has resulted in the vehicles having diminished value, thereby depriving Plaintiff and the Class Members of the benefit of the vehicle (and its value) that they paid for. (FAC, ¶ 8.)

Plaintiff alleges BMW was aware of the Water Pump Defect before Plaintiff purchased her Class Vehicle through sources not available to plaintiff or Class Members, including but not limited to internal testing, consumer complaints, Technical Service Bulletins, prior water pump design experience, the redesign of the water pump system, aggregate data from BMW's dealers (such as warranty data,

goodwill data, repair data and parts purchases), reports from the National Highway Transportation and Safety Administration ("NHTSA"), and from other internal and external sources. (FAC, ¶¶ 10, 12-13, 15-18.)

Warranty and goodwill claims of owners of Mini vehicles with this design of the Water Pump (all class vehicles) dramatically rose to approximately 7.5% of all Class Vehicles sold in California, which is where the bulk of MINI vehicles were sold. Indeed, to date, BMW has spent over 3.8 million dollars reimbursing its customers in California for warranty and goodwill claims relating to the failure of the mechanical water pump. (This entails approximately 8,800 claims granted under warranty or good will up to 2012, and a total of over 9,400 claims through 2014.) (See, Harris Declaration, ¶¶ 18-20.)

Although BMW has furnished only the data related to California claims, extrapolating these numbers nationwide results in an additional 7,603 failures, and a nationwide total reimbursement figure of $6,867,411.72. (Harris Declaration, ¶¶ 21-22; McNulty Declaration, ¶ 6, a.-b.)

Despite BMW being on notice of the defect from various internal and external sources, BMW has not recalled the Class Vehicles to repair the Water Pump Defect, has not offered all of the owners and lessees of Class Vehicles a suitable permanent repair free of charge, and has not offered to reimburse all owners and lessees of Class Vehicles who incurred costs relating to the Water Pump Defect, including costs related to inspections/diagnosis, and repair of the Class Vehicles. (FAC, ¶¶ 54-56.)

D.  **The Class Action Complaint Against BMW**

On March 27, 2014, Herremans brought a class action against BMW on behalf herself and a class of California consumers alleging (1) violations of California Consumer Legal Remedies Act, (2) violations of California Unfair Business Practices Act, and (3) fraud. (Docket No. 1.) After the filing of the First Amended Complaint, BMW brought a motion to dismiss, which was opposed by Herremans. The court granted the motion, with leave to amend. (Docket No. 30.)

1     Herremans then filed a Second Amended Complaint. BMW again brought a motion to dismiss, which was opposed by Herremans. The court again granted the motion, with leave to amend. (Docket No. 42.) Herremans then filed a third amended complaint on March 11, 2015. (Docket No. 43.) BMW declined to file another motion to dismiss, and instead agreed to participate in a mediation. (Harris Declaration, ¶ 4.) BMW filed its answer to operative complaint on March 25, 2015. (Docket No. 47.)

    Herremans thereafter filed a fourth amended complaint pursuant to the settlement agreement of the parties. (Docket No. 58-5.)

### E. The Mediation/Settlement Agreement

    On May 19, 2015, the parties participated in a full day mediation session with the honorable Edward A. Infante. The parties agreed on all aspects of the settlement (other than attorneys' fees, costs, and enhancement) after this mediation session, including agreement to a nationwide class for settlement purposes only, and signed a document titled "Herrreman's Settlement Matrix" after the conclusion of these negotiation sessions. After the mediation, the parties negotiated the attorneys' fees, costs, and the enhancement amount and ultimately agreed to these terms in July of 2015. (Harris Declaration, ¶¶ 23-24.)

    Thereafter, the parties negotiated the formal settlement agreement, notice and claim form. The parties reached final agreement regarding the terms of these documents in November of 2015. As part of the settlement, Plaintiff filed a Fourth Amended Complaint, asserting claims on a nationwide basis. (Harris Declaration, ¶ 29; Docket No. 58-5.)

    The court granted several extensions of time for Plaintiff to file a class certification motion, or the motion for preliminary approval, while the parties continued with their negotiations. (See, Docket No.'s 48, 53, 55-57.)

### F. Preliminary Approval

    The motion for preliminary approval was initially heard on February 18, 2016.

-9-

(See, Docket No. 62.) Based on the court's guidance at the hearing, the parties filed supplemental papers in support of the preliminary approval motion, which was granted on March 18, 2016. (See, Docket No.'s 62-66.)

The court certified the Settlement Class as defined in its Order and the Agreement, appointed Plaintiff as the Class Representative, appointed Stephen M. Harris and Robert L. Starr as Class Counsel, and found that the settlement terms were, at least preliminarily, sufficiently fair, reasonable and adequate so as to justify dissemination of notice to class members. (*Id.*)

### G. Investigation And Discovery

Plaintiff conducted a pre-filing and post-filing investigation, including, but not limited to, retaining an expert consultant regarding water pump failures, detailed analysis of the design of the mechanical water pump in existence prior to the change of the design by BMW, review of technical service bulletins, review of publicly available information relating to the nature and extent of the mechanical water pump problem, and obtaining and reviewing approximately 3,000 pages of documents produced by BMW in response to Plaintiff's formal discovery requests. Plaintiff monitored complaints on NHTSA, reviewed data concerning MINI sales, and obtained informally from BMW sales data, warranty and good will claims data, call center records, PUMA records (relating to customer complaints), as well as design data. (Harris Declaration, ¶¶ 11-12.)

The claims administrator maintained a web site and toll-free number as provided for in the Agreement, to facilitate communications with class members. (Haan Declaration, ¶¶ 15-17.) Plaintiff also hired a separate company to create an informational web-site about the settlement. The company, Next Client, used search optimization, structured use of key words, blogs, social media communications and other devices to alert class members about the settlement and its benefits. The website generated 1,140 unique page views. (Harris Declaration, ¶ 13.)

Class counsel also answered telephone and email inquiries from Class